## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

———————————————————————

| | |
|---|---|
| TOMMIE COWANS, LENNY GOLDFARB SCOTT COHEN, JEFFREY FLETCHER MARIA FLETCHER and A FRESH START SOBER LIVING ENVIRONMENT, INC., an Illinois for-profit corporation | ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) ) | CIVIL ACTION NO.: 14-cv-9630
| DANIEL J. RYAN, DEBORAH LYNN RYAN, ROBERT CRAIG, ERIC MUELLER, HEIDI RINEHART, JEFFREY MORRISON, and the AFS LEGAL DEFENSE FUND, NFP, an Illinois not-for-profit corporation | ) ) ) ) ) ) ) |
| Defendants. | ) |

———————————————————————

## PRELIMINARY STATEMENT

This case presents the familiar conflict between the legal principle of non- discrimination and the political principle of not-in-my-back yard.

Plaintiffs assert claims under Federal Fair Housing Act, 42 U.S.C. § 3601, *et seq*. ("FHA"), arising from defendants' conduct. The Defendants have violated the FHA by interfering with the ownership, operation, occupancy and use of two homes leased by plaintiff A Fresh Start Sober Living Environments, Inc. ("AFS") – at 2128 N. Winchester (the "Winchester House") and 530 N. Marshfield (the "Marshfield House") – that AFS operates as housing for disabled persons recovering from alcoholism and substance abuse. Defendants' conduct that

1

violated the FHA includes harassing, threatening, intimidating and coercing residents of the Winchester and Marshfield Houses and AFS employees and owners that has interfered with the plaintiffs' exercise or enjoyment of the homes; using racial epithets directed at the African-American residents of the Marshfield House; assaulting residents of the Marshfield House; invading the privacy of residents of both Houses; creating an organization – AFS Legal Defense Fund, NFP -- for the sole, discriminatory purpose of depriving plaintiffs of the use of their homes; the publication of discriminatory statements; and intimidation of residents of both Houses by photographing and videotaping them with the purpose and intent of breaching the anonymity of the disabled residents of both Houses. Anonymity is a core element of the process of recovering from alcohol or other chemical dependency, and thus the photographing and videotaping are deliberate, willful and malicious efforts to impede and stop the recovery process.

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.§§ Sections 1331, 1343, and 42 U.S.C. § 3613.

2.      Venue is proper in the United States District Court for the Northern District of Illinois as all acts complained of occurred within this District.

## PARTIES

3.      AFS is an Illinois for-profit corporation, with a principle place of business in Chicago, Illinois. It provides affordable housing and supports to individuals with disabilities including those who are recovering from substance abuse and/or alcoholism located at the House. It provides housing for recovering alcoholics and substance abusers at 530 N. Marshfield and 2128 N. Winchester. Each house is located in a residential zone. Each house has a racially diverse makeup.

2

4.     Tommy Cowans, an African-American male, is a former resident of the Winchester House and is a current resident of the Marshfield House.  Mr. Cowans is a person with a disability within the meaning for the Fair Housing Act.  Mr. Cowans relies on his peers at the Marshfield House for support, and his residence at both of the AFS Houses at issue in this case is essential in aiding him in his recovery from alcoholism and substance abuse.

5.     Plaintiff Lenny Goldfarb is the lessee of the Marshfield House.  He is also the president of AFS.  He is an aggrieved person within the meaning of the FHA.

6.     Plaintiffs Jeffrey and Maria Fletcher are the owners of the Marshfield House, and have leased the premises to AFS.  They are aggrieved persons within the meaning of the FHA.

7.     Plaintiff Scott Cohen is a person associated with AFS and is associated with the actual owner of the Winchester House, Gustavo Montes.  He is an aggrieved person within the meaning of the FHA.

8.     Defendants Daniel J. Ryan and Deborah Lynn Ryan (collectively "the Ryans" and individually either "Daniel Ryan" and "Deborah Ryan") are husband and wife and live at 530 N. Marshfield, Chicago, IL, next door to the Marshfield House.  Daniel J. Ryan is a director of AFS Legal Defense Fund.

9.     Defendant Robert Craig lives at 526 N. Marshfield, Chicago, IL, adjacent to the Marshfield House.  Mr. Craig is a licensed real estate agent.  He is also a director of AFS Legal Defense Fund.

10.     Defendant Eric Mueller lives at 1647 N. Ohio, Chicago, IL, parallel to the Marshfield House, and is a director of AFS Legal Defense Fund.

11.     Defendant Heidi Reinhart resides at 2126 N. Winchester, Chicago, IL, adjacent to the Winchester House.

12.     Defendant Jeff Morrison lives at 2126 N. Winchester, Chicago, IL adjacent to the Winchester House.

13.     Defendant AFS Legal Defense Fund, NPP, (herein after "LDF") is an Illinois not-for-profit corporation.

## I.     STATEMENT OF FACTS

### A.     A FRESH START AND THE MARSHFIELD AND WINCHESTER HOUSES

14.     A Fresh Start Sober Living Environment, Inc. ("AFS") is an Illinois corporation, whose primary purpose is to provide safe and sober housing for recovering alcoholics and substance abusers.

15.     All residents of AFS-run facilities such as  the Marshfield and Winchester Houses are recovering alcoholics and drug addicts who are actively participating in 12-step programs such as Alcoholics Anonymous or Narcotics Anonymous.  Substantially all residents of these Houses have completed alcohol and substance abuse treatment.  All residents of these facilities reside there for the purpose of ameliorating the effects of drug addiction and alcoholism, and to take steps to live independently without the use of drugs or alcohol.  AFS receives referrals from the Lawyers Assistance Program of the Illinois Bar, the firefighters' employees' assistance program; several law enforcement employee assistance programs, and several established substance abuse treatment centers.

16.     Substantially all the residents of the Marshfield and Winchester Houses are employed, in school, attending out-patient substance abuse treatment programs, or some combination of these circumstances.  Included in the professions of AFS residents are attorneys, law enforcement personnel, fire fighters, and real estate brokers.  All of these individuals reside

in these Houses because of their need to live in supportive housing environment to assist in their

from alcoholism and/or substance abuse. They live at these AFS facilities by choice.

17.     All of the individuals who participate in the AFS program and reside at its houses

are individuals with a handicap or disability by virtue of their alcohol or chemical dependency

combined with their completion of substance abuse treatment programs. As a condition of

residency at these Houses, all AFS residents must remain drug and alcohol-free while they reside

there.

18.     Residents of an AFS facility must willingly choose to participate in the AFS

program. The Marshfield and Winchester Houses are single family homes with similar support

and collaborative functions as found in a traditional family.

19.     All residents of the Marshfield and Winchester Houses live together as a family

and make group decisions based on democratic procedures. All of the residents of the Marshfield

and Winchester Houses have access to the entire house, and all of the household facilities.

Within each House, all residents function together as a single housekeeping unit. There are not

any special locks on the doors of the bedrooms or other rooms at either location. The residents

share all household responsibilities, and live together to create a "family" atmosphere, where all

aspects of domestic life are shared by all of the residents.

20.     AFS is not a substance abuse treatment center, halfway house, shelter, or a

community care facility. There is no treatment, counseling, therapy, or any type of health care

services provided at either the Marshfield or Winchester Houses. AFS is not licensed by the

State of Illinois, nor is it required to be licensed. There are no institutional personnel involved in

the supervision or management of either House.

21.     On or about August 31, 2013  Mr. Goldfarb entered into a lease agreement with Jeffrey and Maria Fletcher to lease the Marshfield House for use as a sober house.

22.     In 2012, AFS entered into a lease agreement with Gustavo Montes to lease 2128 N. Winchester for use as a sober house.

**B.      VIOLATIONS OF THE FAIR HOUSING ACT AT THE MARSHFIELD HOSUE BY THE RYANS AND CRAIG**

23.     On or about September 13, 2013 it was reported to AFS that a furniture delivery driver was being harassed by the Ryans, Mr. Craig and other neighbors.  He was verbally abused, and his attempt to make the delivery was impeded by the Ryans.  The Ryans told him he could not go in the house because AFS was operating an illegal business.  The delivery person was forced to call Goldfarb, President of AFS, to report the Ryans' conduct.  When Goldfarb arrived at the scene, police were already present, having been called by the Ryans or one of the other neighbors.  In addition, the Ryans and Defendant Craig began screaming at Goldfarb.  Both Daniel Ryan and Craig yelled at Goldfarb "We're not going to let this happen."  Daniel Ryan also screamed at Goldfarb "I am not going to let them recover in peace.  You're opening a fucking halfway house. I have a little girl and she is not going to be saying hello to you." Defendant Craig yelled "This is a family street.  Families should be moving in here, not this." The Ryans took pictures of the delivery man carrying the furniture into the house.  They took pictures of Goldfarb, and Juan Hernandez, Executive Director of AFS.  The police took no action.

24.     On or about September 12, 2013, Defendant Deborah Lynn Ryan contacted New Hope Recovery Center, a substance abuse treatment center which makes referrals to AFS.  The subject line of the email was "Your Company is advertised as a partner on A Fresh Start Sober

Living's website owned and operated by Mr. Lenny Goldfarb." Her email to New Hope stated: "Best way to contact me: Call me" The email further stated: "Is New Hope Recovery a business partner of A Fresh Start Sober Living in Chicago? The company seems to be operating without proper permits/zoning approvals all over the city. What's more, the owner appears to be an unscrupulous businessman. You may want to let your marketing department know that Mr. Lenny Goldfarb lists your organization on his corporate website as a partner. This could be potentially damaging to New Hope Recovery's reputation."

25. On or about September 12, 2013, Deborah Ryan followed up her email to New Hope Recovery with a telephone call. She talked to the Director of Finance and Administration and wanted to know why New Hope Recovery did business with A Fresh Start and that it might be in its [New Hope Recovery] best interests to cease its relationship with AFS.

26. Deborah Ryan then contacted other treatment providers listed on the AFS website to make the same complaint as she did to New Hope Recovery. Among the available facilities Ryan contacted was Harborview, and the Chicago Fire Fighter's employee assistance program.

27. Hazelden, a nationally renowned substance abuse treatment center, located in Rochester, Minnesota was contacted anonymously with the same comments about being listed on the AFS and the same disparaging comments made about AFS and Mr. Goldfarb as were made to New Hope Recovery. As a result of the anonymous call and its contents, Hazelden requested that its name be removed from the AFS site.

28. On or about February 11, 2014, Goldfarb and a resident of the Marshfield House were talking in front of the house. Defendant Daniel Ryan left his house and walked directly towards them and stated: "It will not go well for Fresh Start."

29.    On or about February 21, 2014, an employee of AFS and a resident of the Marshfield House saw the Ryans talking with Defendant Craig. They overheard them talking about AFS, and the conversation included the comment about AFS that "we can still get them out."

30.    On or about February 22, 2014, as two residents of the Marshfield House left it for the day, they encountered Mr. Craig. In response to their wishing him a good day, Craig responded by stating that he was "not doing well."

31.    As the result of repeated incidents with the Ryans and Mr. Craig, AFS decided to install video cameras on the Marshfield House. On or about February 24, 2014, defendant Daniel Ryan, who resides next door to the Marshfield House, was observed videotaping the security camera installer as he installed the cameras. The installer was working on the back porch of the residence, which has a six foot high privacy fence. So he could overcome the impediment of the privacy fence, Mr. Ryan had elevated himself so that he could see over the fence. This installer reported the incident to AFS.

32.    On numerous occasions during the Winter and Spring of 2014 and continuing to today's date, Defendant Deborah Lynn Ryan has climbed to the roof of her house next door to the Marshfield House and photographed and videotaped one or more AFS residents enjoying the back deck of the Marshfield House. Again, the back deck of the Marshfield House has a six foot high privacy fence. AFS installed this fence as a result of Ryan's intrusions in this regard and in an attempt to protect their privacy and enjoyment of the back deck and to deter the Ryans from their invasive activities. Undeterred in her obnoxious and malicious behavior, Ryan simply moved further up the roof of her house and has continued the photographing and videotaping.

While videotaping the AFS residents enjoying their property, Ryan has shouted derogatory statements concerning their disability and residency at AFS.

33.     On or about March 5, 2014, Defendant, Deborah Lynn Ryan was observed videotaping the AFS residents leaving their residence in the morning.  Ryan photographing and videotaping Marshfield House residents is a common and regular occurrence.

34.     On or about March 6, 2014, the Ryans harassed a delivery man delivering pizza to residents at the Marshfield House.  The Ryans videotaped the delivery man walking up the steps to the Marshfield House and asked him whether he was "really delivering pizza."

35.     On or about March 11, 2014, Defendant, Robert Craig sent an email to Goldfarb about the Marshfield House.  The email read:  "3 reported thefts, reported police suspicion of gang activity selling drugs and a reported heroin overdose in house all in 2 weeks of living there! Way to go Lenny."  None of the accusations were true.

36.     On or about March 14, 2014, Defendant Deborah Lynn Ryan harassed a UPS delivery man bringing a package to the Marshfield House.  Ryan took photographs of the delivery man, and questioned him about the nature of his delivery.

37.     On or about March 23, 2014, AFS resident K.I. was enjoying the privacy of Marshfield House deck.   Defendant Daniel J. Ryan appeared on the roof of his neighboring house and began a verbal altercation with K.I.  Ryan said he was going to shoot K.I., and demonstrated how he was going to do it by positioning his forefinger and thumb to make it look like a handgun, pointing it at K.I. and yelling "pow, pow."  He also yelled at K.I., "Niggers go home."

38.     As a result of this incident, K.I. was not allowed to have his children visit him at the Marshfield House.  A police report was made of the incident.

39.     On or about March 23, 2014, Defendant Debra Lynn Ryan pulled her car to the front of the Marshfield House and parked it so close to a car owned by Marshfield House resident Z.R. that Ryan's car bumper touched that of Z.R.'s car.  Defendant Daniel Ryan then arrived at the scene and intentionally parked his own car partially in an alley and partially in the street, so that it was angled to intentionally block Z.R.'s car in between Daniel Ryan's car and Deborah Ryan's car.   When Z.R. asked Daniel Ryan to move his (Ryan's) car so he (Z.R.) could leave, Ryan refused.  The confrontation escalated to the point that the police were called, at which time a police report was issued recommending that Daniel Ryan be arrested.

40.     As a result of these incidents, AFS hired off-duty law enforcement personnel to provide protection against the harassment and intimidation and any other behavior by the Ryans and Craig that interfere with the use and enjoyment of the Marshfield House by its residents and AFS personnel.

41.     During the time period of April 29-30, 2014, the AFS manager for the Marshfield House, picked up numerous times cigarette butts that had been deposited in front of the house. Prior to the cigarette butts being picked up, the Ryans took photographs of the butts.  The cigarette butts were not placed in front of the Marshfield House by any of its residents.  Those residents have a designated smoking area on the back deck with a receptacle for the deposit of cigarette butts.

42.     On or about May 2, 2014, a new resident was moving into the Marshfield House being assisted by his (the new resident's) mother.  As the new resident and his mother were unloading the new resident's belongings, defendant Deborah Lynn Ryan verbally accosted the new resident and his mother, and harassed them by taking pictures of them, their car and the car's license plate.

43.     On or about February 28, 2014, the Ryans purported to report to AFS an alleged theft of their property by one of the African-American residents of the Marshfield House.  The Ryans email said that earlier that same day " one of your clients was seen taking sealed packages addressed to us located behind our locked gangway gate.  A neighbor who witnessed the theft, confronted your client and retrieved the packages.  After being confronted and asked to turn over the packages, your client entered 530 N. Marshfield."

44.     The Ryans' email misrepresented the incident to which it referred.  What actually happened was a malicious and ham-handed effort to frame a Marshfield House resident into being accused of theft.  There is a common walkway that separates the Marshfield House from the Ryan's next-door residence.  This walkway is not locked.  On February 28, 2014, an extremely cold day in one of the coldest Chicago Winters ever recorded, a resident of the Marshfield House, who is African-American, was executing his assigned task of cleaning the area in the front and side of the Marshfield House, including the walkway between the Marshfield House and the Ryans' residence.  The Marshfield House resident noticed an empty, wet box in the walkway.  This box was frozen to the ground.  This resident dislodged the box to discard it and clean the area.  After the resident dislodged the box, defendant Daniel Ryan angrily confronted the resident.  Ryan called the resident "a scary black man," and accused him of trying to steal the box.  No neighbors were involved in the incident.  Neither Ryan (nor the non-existent neighbor) made a police report about the made-up theft.

45.     On or about September 17, 2014, defendant Robert Craig instigated a verbal altercation with Marshfield House resident T.B. and his guest.  T.B. and his guest were on fenced-in deck in the backyard, and the guest was upset after having just been in a car accident.  Craig appeared from his property and began yelling at T.B. and the guest, calling them "fucking

addicts." He accused them of making too much noise. He then re-entered his house and slammed his door.

46. There have been additional incidents involving the Ryans. For example, Marshfield House resident, J.M, was using the fenced-in back deck when he observed defendant Daniel Ryan staring at him and taking pictures. J.M. told Ryan that he was "sick of having his picture taken, of his guests having their pictures taken, of his [Ryan's] constant staring and leering at him and the other residents."

47. Anonymity is a cornerstone aspect to recovery for Alcoholics Anonymous and other 12-step substance abuse programs. Destroying this anonymity through photographs and videotaping is particularly offensive and damaging to recovering alcoholics and addicts. The defendants do not take the pictures or videotape of any of their non-disabled neighbors.

48. The Ryans' photographing and videotaping of Marshfield House residents and their guests is a regular and repeated intrusion on the residents and their guests, and represents particularly malicious and cruel offenses against these residents. The Ryans have persisted in this activity despite numerous requests for the Ryans to stop this behavior.

49. The defendant Ryans knew or should have known that the photographing and videotaping of Marshfield House residents was offensive and would intimidate and harass persons with disabilities because of their disabilities. This conduct also appears aimed at deliberately inhibiting the recovery of these residents.

50. Residents have ceased residing at the Marshfield House, in part, because of the harassment visited upon them, including the photographing and videotaping activities.

51. The Winchester House is also subject to malicious and offensive recording activities by the defendants. Borrowing from the Ryans' playbook, defendants Heidi Rinehart

and Jeffrey Morrison installed "security cameras" in the front and back of their home at 2126 N. Winchester that is next to the Winchester House. The backyard camera on the Rinehart/Morrison House is pointed directly at the deck of the Winchester House. The camera Rinehart and Morrison installed on the front of their house is pointed directly at the front walkway of the Winchester House.

### C      DEFENDANTS ARE INFORMED THAT THE FAIR HOUSING ACT PROTECTS THE SERVICES AFS IS PROVIDING AT THE MARSHFIELD AND WINCHESTER HOUSES

52. Scott Waguespack is the Alderman for the City of Chicago's 32nd ward. The Winchester House is located in the 32nd ward.

53. Proco Joseph Moreno is the Alderman for the City of Chicago's 1st ward. The Marshfield House is located in the 1st ward.

54. All defendants, except defendant AFS Legal Defense Fund NFP, complained to Aldermen Waguespack and Moreno about the Marshfield and Winchester Houses.

55. As a result of the complaints, Aldermen Moreno and the Chicago Grand Neighbors Association ("CGNA") organized a "special meeting" to address AFS' use of the Marshfield and Winchester Houses. Alderman Waguespack also participated in the meeting. All of the named defendants attended and actively participated in the discussion. The meeting was held on October 21, 2013.

56. Both Aldermen Moreno and Waguespack complained to the Illinois Department of Alcohol and Substance Abuse in an attempt to force AFS to become licensed by the State of Illinois as an "alcoholism or drug dependency facility." Both Aldermen urged the agency to undertake an investigation of AFS operations and houses.

57.     In response to the Aldermen's complaints, Illinois Department of Alcohol and Substance Abuse inspected an AFS house and determined that since no substance abuse treatment services were being conducted by AFS, it did not need to be licensed.

58.     At a follow-up CGNA meeting held on February 22, 2014, Raymond Valadez, Chief of Staff for Alderman Moreno reported on efforts to have the City of Chicago find that the Marshfield House or the Winchester House did not comply with zoning laws.  Mr. Valadez reported that "[t]he lead [City] attorney informed me that after much research and time spent trying to address the situation, the Law Dept. has determined that under the City Code, which must abide by the federal Fair Housing Act, A Fresh Start has the legal right to occupy the buildings, and they do not require a special use through the Zoning Board of Appeals."

59.     Mr. Valadez explained, "since recovering alcoholics or addicts are considered disabled, or handicapped, they are considered a 'household' according to the City code and the federal Fair Housing Act . . .  As such, they do not require any special zoning permissions, just like any other family would not require a zoning permission to reside in their homes."  Mr. Valadez concluded that "the City [of Chicago] does not have any legal mechanism to prevent the A Fresh Start housing offering from being established."

60.     In response to questions about the Marshfield House and Winchester Houses presenting dangers and hazards to the communities in which they were located, Paul Sajovec, Chief of Staff for Waguespack, said that the facts did not support that conclusion or any relief against these Houses:  "There have not been enough 911 calls to substantiate a nuisance."

**D.     AFS' REASONABLE ACCOMMODATION REQUESTS OF WHICH DEFENDANTS WERE INFORMED**

61.     By letters dated October 18, 2013, AFS made reasonable accommodation requests pursuant to the federal Fair Housing Act, 42 U.S.C. §3604(f)(3)(B) to Patricia Scudiero, Zoning Administrator, City of City Chicago.  AFS proposed that concerning the application of the City's zoning code to AFS' use of both the Marshfield and Winchester Houses, that these houses be treated as "households" under the City's zoning code.

62.     The letter detailed the AFS concept, who resides at AFS, the nature of the disability of the residents, the nature of the households, the AFS rules, the nature of the households that are created, and the therapeutic benefits that AFS residents receive from residing together under the AFS concept.

63.     The letter asked that the City of Chicago treat the residents of an AFS facility as a "household" by waiving the number of unrelated persons that can reside together as a family, and to treat the use of dwelling as a single family use.  The term "household" as defined by the City's zoning code is the term used to define "family."  The term Household is defined by the City's municipal code as follows: "One or more persons related by blood, marriage, legal adoption or guardianship, plus not more than 3 additional persons, all of whom live together as a single housekeeping unit; or one or more handicapped persons, as defined in the Fair Housing Amendments Act of 1988, plus not more than 3 additional persons, all of whom live together as a single housekeeping unit."

64.     The City of Chicago has not issued a determination of AFS's requests for reasonable accommodation as to the Marshfield and Winchester Houses.

65.     The AFS reasonable accommodation requests were provided to Aldermen Moreno and Waugespack, who in turn made copies of the letters available to the defendants.

15

66. Thus, defendants know about AFS' efforts to obtain these reasonable accommodation determinations, and knew about them before defendants initiated the lawsuits described later in this complaint.

67. In addition, before defendants filed the lawsuits described later in the complaint, defendants knew about the views of the City of Chicago that the residents of the Marshfield and Winchester Houses were subject to the protections of the Fair Housing Act, and that application of applicable zoning laws as the defendants wanted would violate the Fair Housing Act's prohibition on discrimination against those, like the residents of the Marshfield and Winchester Houses, with disabilities.

**E. THE RYANS, ROBERT CRAIG AND THE FLETCHERS FURTHER BULLYING AND HARRASSMENT PROHIBITED BY THE FAIR HOUSING ACT**

68. On or about September 10, 2013, defendants the Ryans harassed and threatened plaintiff Jeffrey Fletcher, one of the owners of the Marshfield House, and attempted to intimidate him. Daniel Ryan said he would sue Fletcher and told him: "It will cost you more money to get sued by me than you would make renting your house."

69. Daniel Ryan promised to make the threatened lawsuit as painful and embarrassing as possible for Fletcher: "I will serve you papers at work to publically humiliate you . . . I will call your boss. I will show up at your place of work."

70. Daniel Ryan continued: "I can't believe you're not afraid of me coming after you. I have money and will spend every dime coming after you. I sue people, this is what I do and I always win. I will make your life miserable. I will make things very uncomfortable for your tenant and their clients."

16

71.     During this same conversation, Daniel Ryan told AFS President Goldfarb "I will not be a good neighbor."

72.     Defendant Deborah Ryan stated: "We will tell everybody what kind of neighbor you are."

73.     Defendant Robert Craig was also present for this conversation.  Craig said to plaintiffs Fletcher and Goldfarb:  "I don't have a problem with these people, just not in my neighborhood and next to my house."  Craig claimed that "[y]ou're destroying the block and neighborhood."  Craig told Fletcher "I could have found a nice family for you to rent to."  "Now we have to move."

74.     Harassing Jeffrey Fletcher was not enough for defendant Daniel Ryan.  That same day, he called plaintiff Maria Fletcher and harassed and threatened her:  "If you're renting to a halfway house, I will sue you."

75.     Mr. Fletcher's motorcycle was vandalized outside his office the same day Daniel Ryan made the statements.

76.     On or about July 17, 2014, an attorney for the plaintiffs inspected the property around the Marshfield House.  He discovered on the ground next to the trash can for the Marshfield House an empty prescription bottle for Defendant Daniel Ryan.  The prescription was for a 30 day supply of Zolpidem, the generic form of Ambien.

**F.     THE DEFENDANTS' STATE COURT LAWSUITS THAT FURTHER VIOLATE THE FAIR HOUSING ACT**

77.     On or about March 13, 2014 defendants Daniel Ryan, Robert Craig and Eric Mueller formed an organization known as the "AFS Legal Defense Fund, NFP."  Articles of Incorporation were granted on May 9, 2014.

17

78.     Unwilling to accept the City of Chicago's determination about the applicability of the Fair Housing Act to protect the AFS operations at the Winchester and Marshfield Houses, on or about April 7, 2014, the non-profit defense fund formed by Daniel Ryan, Robert Craig and Eric Mueller filed in the Chancery Division of the Circuit Court of Cook County the lawsuit *AFS Legal Defense Fund, NFP v. A Fresh Start Sober Living Environments, Inc., the City of Chicago Zoning Board of Appeals, and Jeffrey and Maria Fletcher*, 2014 CH 5880.  The *AFS Legal Defense Fund* action concerned the Winchester House.

79.     On the same day, defendants Heidi Rinehart and Jeffrey Morrison filed in the Chancery Division of the Circuit Court of Cook County *Jeffrey Morrison and Heidi Rinehart v. City of Chicago Board of Zoning Appeals, A Fresh Start Sober Living Environment, Inc. and Scott Cohen*, 2014 CH 6509.  The Morrison action concerned the Marshfield House.

80.     Both lawsuits asked the Court to force the ZBA to require AFS to submit applications for special use permits for the Marshfield and Winchester Houses, and for the Court to declare that these permit applications had to be denied.  Both lawsuits also sought declarations from the Court that the protections of the Fair Housing Act did not apply to the residents of the Marshfield and Winchester Houses.  Significantly, both lawsuits asked the Court also to declare that A Fresh Start be evicted from the Marshfield and Winchester Houses for violating applicable City of Chicago zoning laws.

81.     Showing the discriminatory animus and intent propelling the lawsuits, both lawsuits make conclusory and unsubstantiated allegations that there has been an increase in crime and police presence relating to theft and drug activity; traffic problems, noise and loitering issues, excessive trash issues that has resulted in substantial harm, the loss of living conditions

and creating an unsafe environment and privacy invasion for the homeowners and residents in those neighborhoods."

82.    Both complaints seek to stereotype the residents of the Marshfield and Winchester Houses by characterizing them as "transients" as opposed to residents in a recovery setting.

83.    Not only is there no basis in the Legal Defense Fund complaint for the allegations of harm Rinehart and Morrison made in the complaint about the Marshfield House, their own actions show that they expect an enormous financial benefit from their house located near the Marshfield House.  Rinehart and Morrison have listed their house at 2126 N. Winchester for sale at a price of $889,000.  According to the Cook County Recorder of Deeds, in 2012, Rinehart and Morrison refinanced this house for $646,000.

84.    Defendant Daniel Ryan made good on his threat to serve Mr. Fletcher at his office with the summons and complaint concerning the Winchester House.  Plaintiff, Maria Fletcher was served with the summons and complaint at the Fletcher's home.

85.    On or about February 26, 2014, the Ryans told a local newspaper that they object to a federal law that says residents of such recovery homes constitute a household and are protected under the Fair Housing Act for people with disabilities.  "Unrelated men that have never met each other and pay rent by the week, that's a household?"

86.    On November 12, 2014, the LDF and Rinehart's lawsuits against AFS were dismissed without prejudice.  The claims asserted against the Chicago Zoning Board of Appeals were dismissed with prejudice.

87.    The effect of defendants' actions have been to attempt in multiple ways to prevent the plaintiffs from residing at the dwelling of their choice or in any other home zoned for single family use in the City of Chicago

19

88.     Plaintiffs are aggrieved persons under the Fair Housing Act as they are disabled persons or associated with disabled persons under the Fair Housing Amendments act of 1988, 42 U.S.C. Section 3602(d) and (I) who have been injured by defendants' discriminatory conduct and have suffered a loss of civil rights as a result of the defendants' conduct.

89.     The Marshfield and Winchester Houses are dwellings within the meaning of section 802(b) of the Fair Housing Act, 42 U.S.C. Section 3602(b).

90.     The effect of the defendants' actions is to deny needed housing opportunities to recovering alcoholics and substance abusers within the City of Chicago.

91.     The effect of defendants' conduct is to limit the housing opportunities of unrelated disabled persons by denying them the right to live together as a group in any residential zoning district in within the State of Illinois.

92.     By filing lawsuit in state court, the defendants seek to deprive the plaintiffs of their protected status under the Fair Housing Act, and to deprive the plaintiffs of their rights under the Fair Housing Act.  In addition, the defendants are seeking an illegal objective by attempting to deprive the plaintiffs of their ability to live in the housing of their choice.

93.     Plaintiffs are living in fear of losing their home and are suffering anxiety, emotional distress, pain, setbacks in their efforts at recovery, and other irreparable harm as a result of the defendants' actions.  They have no adequate remedy at law.

94.     After failing to convince the City of Chicago to require AFS to apply for a special use permit, defendants have used the legal system for illegal purposes and have threatened, intimidated, harassed and coerced the plaintiffs after they have exercised their rights under the Federal Fair Housing Act.

95.     The Defendants continue to intentionally and maliciously harass, intimidate and interfere with the plaintiffs and persons associated with the plaintiffs with the intent of preventing AFS from using the Marshfield and Winchester Houses from existing in their neighborhoods.

## COUNT I
## FAIR HOUSING ACT
### (all defendants)

96.     Plaintiffs reallege and incorporate herein by reference paragraphs 1 through 95 above.

97.     The Defendants are violating Plaintiffs' rights under the Fair Housing Act, 42 U.S.C. Sections 3601, *et. seq.* and its implementing regulations by:

a.      denying and otherwise making housing unavailable to the Plaintiffs because of their race, national origin, and disability;

b.      discriminating against the individual plaintiffs because of their race, national origin and disability;

c.      utilizing the legal system as a pretext to exclude the Plaintiffs from their homes on the basis of race, national origin and disability;

d.      interfering with the right of the Plaintiffs to live in the dwelling of their choice;

e.      publishing material indicating a discriminatory preference against the disabled with respect to housing opportunities;

f.      coercing, harassing, and interfering with the right of the individual plaintiffs to live and enjoy their home after the exercise of their fair housing rights; and

g.      steering individuals with disabilities away from certain housing opportunities.

## RELIEF SOUGHT

21

**WHEREFORE**, Plaintiffs pray that the Court award them the following relief:

1.     Enter a temporary restraining order and/or preliminary and permanent injunctions restraining Defendants from engaging in conduct that either interferes, harasses or coerces in any manner with Plaintiffs' current use of the dwellings located at 530 N. Marshfield and 2128 W. Winchester, Chicago, Illinois;

2.     Enter a declaratory judgment that Defendants have acted unlawfully under the federal Fair Housing Act and the Illinois Human Relations;

3.     Grant an award of reasonable costs and attorneys' fees;

4.     Grant an award of compensatory damages to the Plaintiffs;

5.     Grant an award of punitive damages to the Plaintiffs; and

6.     Order such other relief as the Court deems just and proper.

Dated: December 2, 2014                    Respectfully submitted,

By:    /s/ Leland H. Chait

Leland H. Chait, Esq.
SUGAR FELSENTHAL GRAIS & HAMMER LLP
30 N. LaSalle Street, Suite 3000
Chicago, Illinois 60602
Telephone:  (312) 704-9400
Facsimile:  (312) 372-7951

For Plaintiffs Lenny Goldfarb, Scott Lee Cohen, Maria Fletcher, Jeffrey Fletcher, and A Fresh Start Sober Living Environments, Inc.

By:  /s/ Steven G. Polin

Steven G. Polin
Law Office of Steven G. Polin
3034 Tennyson Street, NW
Washington, D.C. 20015
Telephone:     202-331-5848
Facsimile:     202-331-5849

22

(*Pro Hac Vice* application pending)

For Plaintiff Tommie Cowans